**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MARY SUN, BARBARA GRAZIOLI, WILLIAM WOLF, CHRISTINA HILL, ALEXIS FENNESSY, LATONYA WRIGHT, PARVEEN SANGHA, LAUREN WOLF, ROZALIYA RIPA, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

TARGET CORP.,

Defendant.

Civil Action No. ________________

**CLASS ACTION COMPLAINT**

Plaintiffs Mary Sun, Barbara Grazioli, William Wolf, Christina Hill, Alexis Fennessy, Latonya Wright, Parveen Sangha, Lauren Wolf, and Rozaliya Ripa (collectively, the "Plaintiffs"), individually and on behalf of the Classes defined herein of similarly situated consumers, bring this class action against Defendant Target Corp. ("Defendant" or "Target"), and allege the following:

**INTRODUCTION**

1. This is a case about fairness. In 2025, President Trump imposed illegal tariffs. Defendant Target passed through the cost of those tariffs to its customers, in whole or in part, on thousands of products. Thus, *Plaintiffs* and other customers covered the tariff costs that Target incurred. Yet after the tariffs were struck down by the Supreme Court, *Target* began receiving a refund of the tariffs it paid—even though it had already recouped those sums. As a result, Target is receiving a double recovery: It paid tariffs, recovered those costs from its customers, and yet is recovering those costs again from the U.S. government. Plaintiffs and the Class they seek to represent, however, paid inflated prices because of illegal tariffs. Target has not agreed to refund

the overpayments to Plaintiffs and other customers. This case seeks to prevent Target from retaining a windfall at the expense of Plaintiffs and the Class.

2. Starting in February 2025, President Trump invoked the International Emergency Economic Powers Act ("IEEPA") to issue a series of executive orders that imposed sweeping new tariffs on imports from virtually every U.S. trading partner.

3. Companies proceeded to pass through all or some of these IEEPA tariffs to consumers across the United States. The companies frequently were explicit that they were raising prices due to the IEEPA tariffs—telling their customers, investors, and the media that the IEEPA tariffs were the reason they chose to increase prices, at a time when many of their customers already were struggling financially and reeling from the inflation of the previous several years.

4. In February 2026, the Supreme Court found the IEEPA tariffs unlawful.

5. Thousands of companies that paid IEEPA tariffs have filed claims for reimbursement. The total amount of refunds is estimated at $166 billion plus interest. The U.S. government has already repaid many billions.

6. But most consumers have received nothing.

7. That is because the vast majority of those companies have tried to avoid returning to their customers the additional amounts those customers paid due to the illegal tariffs, despite receiving refunds from the U.S. government for those same amounts.

8. Target is one of those companies. Target ranks among the nation's largest retailers, with approximately $105 billion in net sales each year. Target raised its prices on thousands of products in response to the IEEPA tariffs, and collected hundreds of millions—or even billions of dollars—from its customers to offset those tariffs. Target then pursued and is now receiving a refund of those sums (and any other IEEPA tariffs it paid) from the U.S. government. Target received just shy of $1 billion in IEEPA tariff refunds from the U.S. government *in the second*

*quarter of 2026 alone*. And yet Target has declined to answer whether it will return any of that money to its customers who paid tariff surcharges on its goods.

9. By retaining both the amounts paid by customers to absorb the tariffs and the refunds it received from the U.S. government for those same tariffs, Target is trying to enjoy a double recovery—at its customers' expense.

10. The law of unjust enrichment exists to prevent precisely this kind of windfall: the retention of two recoveries for a single expense. Target's retention of both the tariff-related amounts collected from its customers and the corresponding tariff refunds give rise to claims for unjust enrichment (and, in the alternative, money had and received and breach of contract), as well as violations of state consumer protection laws.

11. Plaintiffs and the members of the Class seek restitution of the tariff overcharges they paid, along with all other damages, fees, and costs to which they are entitled under the law.

12. Target had every right to seek a refund from the government for the unlawful tariffs. It has no right, however, to obtain that refund and retain the amounts it already has recovered from consumers for those same unlawful tariffs. What might have been compensation for a legitimate business expense has become a windfall. The Court should require Target to disgorge those twice-recovered funds and return them to the customers who actually bore the cost.

**PARTIES**

13. Plaintiff Mary Sun is a resident of Paoli, Pennsylvania. She is a U.S. citizen who domiciled in the Commonwealth of Pennsylvania.

14. Barbara Grazioli is a resident of Maple Shade, New Jersey. She is a U.S. citizen who is domiciled in the State of New Jersey.

15. Plaintiff William Wolf is a resident of Freedom, Pennsylvania. He is a U.S. citizen who is domiciled in the Commonwealth of Pennsylvania.

16. Plaintiff Christina Hill is a resident of Amherst, New York. She is a U.S. citizen who is domiciled in the State of New York.

17. Plaintiff LaTonya Wright is a resident of Brooklyn, New York. She is a U.S. citizen who is domiciled in the State of New York.

18. Plaintiff Alexis Fennessy is a resident of Newport News, Virginia. She is a U.S. citizen who is domiciled in the Commonwealth of Virginia.

19. Plaintiff Parveen Sangha is a resident of North Royalton, Ohio. She is a U.S. citizen who is domiciled in the State of Ohio.

20. Plaintiff Lauren Wolf is a resident of Fort Worth, Texas. She is a U.S. citizen who is domiciled in the State of Texas.

21. Plaintiff Rozaliya Ripa is a resident of Round Rock, Texas. She is a U.S. citizen who is domiciled in the State of Texas.

22. Defendant Target Corp. is a publicly traded Minnesota corporation with its principal place of business at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target operates approximately 2,000 retail facilities throughout the United States. Target operates stores in this District and in each of the other Districts in which any of the Plaintiffs reside.

## JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from Target.

24. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

25. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 because an actual controversy exists between the parties regarding Target's obligation to return to its customers sums those customers paid in IEEPA tariff surcharges.

26. This Court has personal jurisdiction over Target because Target is qualified to conduct business as a foreign corporation in the Commonwealth of Pennsylvania. *See* 42 Pa. Cons. Stat. § 5301(a)(2)(i). By registering to conduct business in Pennsylvania and maintaining that registration, Target consented to the exercise of personal jurisdiction by Pennsylvania courts with respect to all causes of action, including those not arising from its activities in Pennsylvania. *See Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 134–46 (2023). Therefore, this Court has personal jurisdiction over Target pursuant to Federal Rule of Civil Procedure 4(k)(1)(A).

27. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d), because Target resides in this district for purposes of the statute: Target maintains contacts within this District (including operating retail stores in this District) that would be sufficient to subject it to personal jurisdiction if this District were a separate state. Plaintiff Barbara Grazioli purchased goods at a Target retail store in this District, and Plaintiff Mary Sun resides in and purchased goods at a Target retail store in this District.

## FACTUAL BACKGROUND

### I. The IEEPA Tariffs

28. The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 et seq., is a federal statute that authorizes the President to regulate certain economic transactions during a declared national emergency.

29. On February 1, 2025, President Trump invoked IEEPA through executive orders to impose additional tariffs on goods imported from Canada, Mexico and China. Those executive

orders went into effect for China on February 4, 2025, and for Mexico and Canada on March 4, 2025.

30. In the ensuing weeks, President Trump expanded the IEEPA tariffs through a series of other executive orders.

31. In particular, on April 2, 2025, President Trump—calling the date "Liberation Day"—signed an executive order that expanded IEEPA tariffs substantially, resulting in the imposition of tariffs on the vast majority of consumer goods imported into the United States from nearly every country in the world.

32. One economic analysis calculated that the tariffs announced on April 2 covered 86% of U.S. imports.[1]

33. The IEEPA tariffs have varied by country of origin and product type.

34. For many imported goods, the baseline tariffs were set at 10%.

35. Imports from dozens of other countries were subject to substantially higher cumulative tariffs that, in the case of China, reached as high as 145%.

36. Under U.S. customs law, the importer of record is the party legally responsible for entering imported goods into the United States and paying any applicable IEEPA tariffs. The importer of record, either directly or through a licensed customs broker acting as its agent, was required to pay the IEEPA tariffs to U.S. Customs and Border Protection ("CBP") when the merchandise entered the United States or shortly thereafter.

37. The vast majority of importers of record passed all or some of the tariff costs on to consumers.

[1] McKibbin, Noland & Shuetrim, *The Global Economic Effects of Trump's 2025 Tariffs*, PIIE Working Paper 25-13, at 2 (June 2025).

38. A June 2025 analysis by the Federal Reserve Bank of New York found that approximately 75% of the surveyed manufacturers and service firms facing tariff-related cost increases chose to pass at least some of those costs along to their customers through higher prices.[2]

39. Likewise, a November 2025 working paper by researchers at the Harvard Business School Pricing Lab found that prices "began rising immediately after the broader tariff measures announced in early March and continued to increase gradually over subsequent months, with imported goods rising roughly twice as much as domestic ones."[3]

40. An April 2026 analysis by The Budget Lab at Yale University estimated, using its preferred methodology, that importers in the aggregate had passed through 86% of the new 2025 tariff costs to consumers on core consumer goods—such as household goods, toys, appliances, and other everyday merchandise—by January 2026.[4]

41. In other words, companies that sold the sort of consumer goods that Target sells generally recovered the supermajority of their tariff costs by raising prices on consumers. They were largely made whole even without receiving refunds from the United States of tariffs that were eventually held to be illegal.

## II. Target Passes the IEEPA Tariffs Through to Consumers

42. Target is one of the largest retailers in the United States, generating approximately $105 billion in net sales each year. Target sells apparel, home goods, food, electronics, and other consumer products directly to consumers through about 2,000 retail stores and its online channels.

43. Nearly all of Target's revenue is generated in the United States.

---

[2] *See* Jaison R. Abel et al., *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Liberty St. Econ. (Fed. Rsrv. Bank of N.Y. June 4, 2025).

[3] Alberto Cavallo, Paola Llamas & Franco M. Vazquez, *Tracking the Short-Run Price Impact of U.S. Tariffs*, NBER Working Paper No. 34496 (Nov. 2025).

[4] The Budget Lab at Yale, *Tracking the Economic Effects of Tariffs* (Apr. 1, 2026).

44. Target sells products to tens of millions of customers in the United States and completes hundreds of millions of transactions in its retail stores each year.

45. Target is an importer of record, including for most of its exclusive brands.

46. In fact, Target is one of the largest importers of consumer goods into the United States.

47. The Journal of Commerce ranked Target as the third-largest U.S. importer by volume in 2024.[5]

48. Approximately one-half of the merchandise Target offers is sourced from outside the United States. China represents the largest country of origin for Target's imported goods. This was true when the IEEPA tariffs went into effect. It was true throughout the Class Period.

49. Target paid IEEPA tariffs to CBP throughout the Class Period.

50. Soon after the IEEPA tariffs went into effect, Target announced that it would begin raising prices in response.

51. In a March 4, 2025, interview—the same day that 25% IEEPA tariffs on Mexico were set to commence—Target CEO Brian Cornell warned that consumers "will likely see prices increase over the next couple of days" for fruits and vegetables, and that if "there's a 25% tariff, those prices will go up . . . certainly over the next week."[6]

52. In April 2025, following the imposition of the Liberation Day tariffs, the CEOs of Target, Walmart and Home Depot visited the White House and warned President Trump that prices "will go up" as a result of the tariffs.[7]

---

[5] JOC Staff, *Top 100 Importer/Exporter Rankings: Largest US Shippers Outpace Hot Market,* J. Com. (May 7, 2025).

[6] Gabrielle Fonrouge & Jacob Pramuk, *Trump's Mexico Tariffs Could Raise Produce Prices in the Next Few Days, Target CEO Says*, CNBC (Mar. 4, 2025); Siddharth Cavale & Juveria Tabassum, *Target Braces for First-Quarter Profit Pressure Due to Tariffs, Low Demand*, Reuters (Mar. 4, 2025).

[7] Marc Caputo & Ben Berkowitz, *Trump Softens Tariff Tone Amid Empty Shelves Warning, Market Slump*, Axios (Apr. 23, 2025).

53. On a May 21, 2025, earnings call, Target's Executive Vice President and Chief Commercial Officer Rick Gomez acknowledged that Target had been "adjusting prices" where needed in response to the tariffs.[8]

54. On that same call, Target CEO Brian Cornell claimed that price increases would be "the very last resort."[9]

55. In reality, the company was already driving a series of dramatic price increases across thousands of products in response to the IEEPA tariffs.

56. Target's own employees and customers took to online platforms to voice their frustration over the sheer number and magnitude of the tariff-related price hikes that were being imposed at their retail stores.

57. One self-identified Target employee posted on the subreddit r/Target in May 2025: "Been doing price change[s] everyday for the past 4 months or so. . . . I just feel terrible putting all these ridiculously high prices up."[10] Another self-identified Target employee posted: "It's ridiculous — the amount of time spent changing 3,000+ labels . . . ."[11]

58. Other self-identified Target employees described their stores as removing price tags on thousands of items "since the whole tariff thing started."[12] A number of media outlets corroborated the allegations of removed tags (as well as tags where the barcode price was higher

---

[8] Target Corp., *Q1 2025 Earnings Call Transcript* at 5 (May 21, 2025).
[9] *Id.* at 3.
[10] TheCeleryCrunch234, Comment to *Brilliant_Safe_5505, I Feel Bad Doing All These Price Changes When Everything Goes Up*, Reddit (May 19, 2025), https://www.reddit.com/r/Target/comments/1kqdbd4/comment/mt4p1rh/.
[11] Teddy Cambosa, *Target Workers Expose Shocking Price Hikes of Up to 96% Allegedly Tied to Trump's Tariff*s, Int'l Bus. Times (June 21, 2025).
[12] Cambosa, *supra* note 11; Oracle90000, Comment to *Hearth and Hand Hidden Prices and Being Raised*, Reddit, r/Target (2025),
https://www.reddit.com/r/Target/comments/1mg4dnv/hearth_and_hand_hidden_prices_and_being_raised/.

than the printed price).[13] Axios reported that Target itself confirmed that it had changed its labeling or re-ticketing practices "to increase flexibility and stay competitive" in this period.[14]

59. A viral post on r/Target featured a side-by-side photo of a *Paw Patrol* toy tagged at $51.99 on May 29, 2025, and then updated to $101.99 by June 7, 2025 (a 96% price increase in fewer than ten days).[15] Another self-identified Target worker uploaded a photo to Reddit in which they were replacing the $9.99 tag on a six-foot phone charging cable with a new tag for $17.99 (an 80% price increase).[16]

60. Reports of tariff-related price hikes continued through the summer and fall. An August 8, 2025, TikTok by a self-identified Target worker showed them tearing price tags off jeans and saying the store couldn't "keep up with constant price changes."[17] A Nebraska-based Target employee named Kaitlin Sonday regularly shared TikToks describing the changes she saw unfolding in stores, including one post where she said, "The price changes I have been seeing have been insane. . . . Quite literally everything has been going up, and I'm honestly very scared."[18] Another Reddit post in December 2025 read: "I work at target and it [i.e., the set of price changes] actually is because of tariffs. Our price changes skyrocketed from about 200 per week to 3-5000 per week to keep up with the constant changing. It drowns our style teams and makes pricing ridiculous for us to keep up with."[19]

---

[13] Kelly Tyko, *Where Tariffs Are Hiding, and How to Tell If You're Paying One*, Axios (Sept. 28, 2025); Desk Report, *Walmart and Target Face Backlash over Removal of Apparel Price Tags*, Textile Today (Sept. 7, 2025); Erin Cabrey, *Are Walmart and Target Asking Employees to Tear the Prices Off Clothing Tags?,* Retail Brew (Aug. 28, 2025).
[14] Tyko, *supra* note 13.
[15] Cambosa*, supra* note 11.
[16] Io Dodds, *Walmart and Target Workers Are Sharing Pics of Price Increases Amid Trump's Trade War*, The Independent (June 2, 2025).
[17] Cabrey, *supra* note 13.
[18] Averee Nelson, *Target Employee Shares Inside Knowledge on Pricing Strategy Amid Tariffs*, Daily Express U.S. (Sept. 12, 2025).
[19] Partypoisonstrikes, Comment to Target No Longer Prices Their Clothes, Reddit, r/mildlyinfuriating (Dec. 31, 2025), https://www.reddit.com/r/mildlyinfuriating/comments/1q064kp/comment/nwydzhz.

61. Collectively, the above statements describe Target raising prices on many thousands of items to pass through tariffs to its customers.

62. Such tariff-related price increases are confirmed by independent analyses. For example, Consumer Edge, a company that tracks consumer spending through shopper-purchase data, showed that prices on certain consumer goods at Target and Walmart became "notably higher" after the IEEPA tariffs went into effect. For example, a Consumer Edge analysis of Target and Walmart prices found that during just the two weeks from May 11 through May 25, dry cat food had increased 13%, wet cat food had increased 8%, liquid laundry detergent had increased 8%, and crackers had increased 3% across the two retailers.[20] Those price changes, even on a non-compounded basis, equate to an annualized inflation rate of 78% to 338%.

63. On March 11, 2026, Target admitted in its 2025 Form 10-K that "U.S. tariffs imposed or threatened to be imposed on several countries in 2025, including China, India, Vietnam and Bangladesh" had "resulted, and could continue to result" in the company "raising prices on certain products."[21]

64. National media outlets reported throughout the Class Period that Target was raising prices in response to tariffs—often prompted by statements from the company's own executives. Examples include:

a. Daily Beast: "Target CEO: You'll Pay More Because of Trump's Tariffs Within Days."[22]

b. Fox Business: "Target, Best Buy CEOs warn of price increases as tariffs take effect."[23]

---

[20] Michael Gunther, *From Tariffs to Totes: Trouble in the Aisle at Walmart and Target*, Consumer Edge (June 2, 2025); Parija Kavilanz, *Here's Where Consumer Purchase Data Shows Walmart Prices Rising*, Investopedia (June 10, 2025).
[21] Target Corp., Annual Report (Form 10-K), at 15 (Mar. 11, 2026).
[22] Janna Brancolini, *Target CEO: You'll Pay More Because of Trump's Tariffs Within Days*, Daily Beast (Mar. 4, 2025).
[23] Daniella Genovese, *Target, Best Buy CEOs Warn of Price Increases as Tariffs Take Effect*, Fox Business (Mar. 4, 2025).

c. Washington Post: "Two of the nation's largest retailers, Best Buy and Target, warned that the new taxes on imports will mean higher prices for American consumers."[24]

d. CNN: "Expect Price Increases in the Next Couple Days Because of Tariffs, Says CEO of Target."[25]

e. New York Post: "Walmart and Target accused of sneakily removing price tags amid tariff-driven price hikes."[26]

f. Daily Express US: "Tariff policies are making their impact felt as Americans witness escalating prices at neighborhood retailers like Target."[27]

g. Fortune: "Retailers like Walmart and Target 'can't keep up with constant price changes' from tariffs . . . ."[28]

h. CNBC: "Prices on Amazon, Walmart and Target have all increased this year as retailers grapple with higher costs due to tariffs."[29]

65. Target substantially raised prices, on many thousands of items, as a direct and proximate result of the unlawful tariffs.

66. The higher prices that consumers paid were largely or wholly a consequence of Target's increased cost of importation.

---

[24] David J. Lynch, Jeff Stein & Evan Halper, Wall Street Worries Trump Tariffs Could Wreck the Souring Economy, Wash. Post (Mar. 4, 2025).

[25] Nathaniel Meyersohn, *Target CEO: Expect Price Increases in the Next Couple Days Because of Tariffs*, CNN (Mar. 4, 2025).

[26] Adriana Diaz, *Walmart and Target Accused of Sneakily Removing Price Tags Amid Tariff-Driven Price Hikes—Leaving Customers Furious*, N.Y. Post (Sept. 2, 2025).

[27] Averee Nelson, *Target Employee Shares Inside Knowledge on Pricing Strategy Amid Tariffs*, Daily Express U.S. (Sept. 12, 2025).

[28] Erin Cabrey & Retail Brew, *Retailers Like Walmart and Target 'Can't Keep Up with Constant Price Changes' from Tariffs, So Many Are Snipping Price Tags and Ditching Discounts*, Fortune (Sept. 22, 2025).

[29] Courtney Reagan, *Retailers Are Raising Prices to Meet Tariffs. Amazon Is Hiking More than Others*, CNBC (Nov. 5, 2025).

67. Target's tariff-related price increases resulted from companywide sourcing and pricing decisions and were implemented across Target's nationwide retail network, raising prices for consumers throughout the United States, including in this District.

68. Target possesses records that would identify its products that were subject to IEEPA tariffs, the amount of the price increases on those goods due to the tariffs, and (in most instances) the customers who purchased those goods.

69. The portion of the purchase price of Target's goods that is attributable to the IEEPA tariffs was not part of its ordinary markup, but an identifiable price increment imposed for the purpose of recovering a specific governmental charge that Target has since recovered, or will recover, from the government.

70. Absent the imposition of the unlawful IEEPA tariffs, Target would not have imposed the tariff-related price increases and could not have done so in a competitive marketplace.

**III. The Supreme Court Invalidates the IEEPA Tariffs**

71. Other lawsuits filed by states and private actors in federal district courts likewise challenged the President's authority to issue the tariffs.

72. On information and belief, Target was aware that these lawsuits had been filed, that the plaintiffs had begun prevailing on the merits as early as May 2025, and that the lawsuits could have enormous financial consequences for the company on the order of billions of dollars—because Target had already paid substantial sums in IEEPA tariffs as an importer of record and would continue to incur substantial additional tariff costs if the tariffs remained in effect.

73. These lawsuits culminated in the Supreme Court's February 20, 2026, decision in *Learning Resources, Inc. v. Trump* (No. 24-1287), in which the Supreme Court invalidated all IEEPA-based tariffs in a 6-3 decision. The Court stated: "We hold that IEEPA does not authorize the President to impose tariffs." *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026). The

Court declined to specify whether and how previously collected tariffs must be refunded, leaving that issue to lower courts and administrative processes. Justice Kavanaugh's dissent specifically recognized the problem that is now presented here: "The United States may be required to refund billions of dollars to importers who paid the IEEPA tariffs, even though some importers may have already passed on costs to consumers or others." *Id.* at 334–35 (Kavanaugh, J., dissenting).

74. On February 22, 2026, U.S. Customs and Border Protection ("CBP") announced that IEEPA tariff collection would cease as of February 24, 2026.

## IV. Target Pursues and Receives Refunds for the Unlawful Tariffs—But Refuses to Return the Money to Consumers

75. According to Brandon Lord, the Executive Director of CBP's Trade Programs Directorate, as of March 4, 2026, the total amount of IEEPA tariffs and estimated tariff deposits collected pursuant to IEEPA is approximately $166 billion.[30]

76. Importers ordinarily deposit estimated duties when merchandise enters the United States. CBP subsequently "liquidates" each entry by determining the final amount of duties legally owed.

77. On March 4, 2026, the CIT issued an order directing CBP to liquidate all unliquidated entries without IEEPA duties, and to reliquidate any entries not "finally liquidated" without IEEPA duties.[31]

78. When liquidation or reliquidation establishes that an importer deposited more than it owed, CBP must refund the excess, together with applicable interest. 19 U.S.C. § 1505(b)-(c).

79. On April 20, 2026, CBP launched the Consolidated Administration and Processing of Entries (CAPE) system to process tariff refunds.

---

[30] *Atmus Filtration, Inc. v.* United States, Ct. No. 26-01259, ECF No. 31, at 6 (Ct. Int'l Trade Mar. 6, 2026).
[31] *Atmus*, ECF No. 21, at 2-3.

80. Only importers of record or the customs broker that filed the entry summaries are permitted to seek tariff refunds through CAPE.

81. CBP has not provided an avenue for consumers to seek a refund from the U.S. government.

82. On May 22, 2026, Target Chief Financial Officer Jim Lee told CNBC that Target was "working through the process" of receiving a refund.[32]

83. On May 29, 2026, Target filed a quarterly report with the SEC confirming that Target was following the established refund filing and validation process through the CAPE system, and that it "began receiving refunds" from CBP for the unlawful tariffs in May 2026.[33]

84. On August 19, 2026, Target filed a report with the Securities and Exchange Commission acknowledging that it had received $994,000,000 in tariff refunds from the U.S. government during the second fiscal quarter of 2026 alone.[34]

85. An April 2026 Citi analysis estimated that Target was due a total of about $2.2 billion in refunds for the invalidated tariffs.[35]

86. Some companies, including UPS and FedEx, have committed to use their tariff refunds to reimburse customers for the tariff pass-throughs that those customers paid.

87. Target has not done so. When asked by media outlets, Target has declined to commit to refunding sums to consumers who paid tariff-driven price increases.

## V. The Plaintiffs

88. Within the Class Period, Plaintiffs each made in-store purchases from Target of products that were imported from countries subject to IEEPA tariffs and that, on information and

[32] *Trump Tariff Refunds: Walmart, Home Depot and Target Apply*, CNBC (May 22, 2026).
[33] Target Corp., *Q1 2026 Form 10-Q*, at 14 (May 29, 2026).
[34] Target Corp., Current Report (Form 8-K), Ex. 99, at 1–2 (Aug. 19, 2026).
[35] Tobias Burns, *Tariff Refunds Begin on Monday. These Retailers Are Due Big Paydays*, CNBC (Apr. 20, 2026).

belief, were at prices inflated by Target's pass-through of IEEPA tariff costs.

89. Plaintiff Mary Sun resides in Paoli, Pennsylvania. She shopped at a Target retail store near her home during the Class Period. She purchased items such as makeup, toiletries, clothing, Christmas presents, groceries, an array of household items, and various other small items (like stocking stuffers for the holidays). She noticed prices rising at Target and attributed the price spikes to tariffs. She purchased items from Target's in-house brands.

90. Plaintiff Barbara Grazioli resides in Maple Shade, New Jersey. She is married with one child and works with focus groups. She purchased items at Target retail stores during the Class Period. Specifically, she shopped at Target retail stores in New Jersey and in Philadelphia during the Class Period. She noticed that prices were going up astronomically and that it was a struggle to keep up with the price increases. Among the items she purchased are makeup, skincare and beauty products and groceries. She went to Target about once or twice a month, and her average trip was about $150 per visit. She noticed that all of the prices were going up shortly after the tariffs took effect—and that prices almost doubled at times and jumped 30 percent or more on many items. She purchased items from Target's in-house brands.

91. Plaintiff William Wolf resides in Freedom, Pennsylvania. He works as a resident nurse, has been married to his wife for 30 years, and has three daughters. He shopped at a Target retail store in Pennsylvania roughly weekly during the Class Period. Among the items he purchased were dishwasher tablets, laundry detergent, clothing, groceries, pet supplies, sporting goods, a television, video game systems, and personal hygiene items. He noticed that prices became much higher during the Class Period. He purchased items from Target's in-house brands.

92. Plaintiff Christina Hill resides in Amherst, New York. She works at a call center for Spectrum Cable. She shopped at one or more Target retail stores in New York a number of times during the Class Period. Among the items she purchased were a toaster, a flatiron, Tide

detergent, and makeup. She saw huge price increases at the time on a wide range of products and attributed them to tariffs. For example, she recognized at the time that a toaster was unusually expensive—it was usually $40 or so but had jumped to around $65 in the Class Period.

93. Plaintiff LaTonya Wright resides in Brooklyn, New York. She shopped at one or more Target retail stores in New York during the Class Period. She has two children. She does security work for a shelter. At Target, she purchased items including household products, body wash, wipes, detergent, tissues, bedding and groceries. She purchased items from Target's in-house brands.

94. Plaintiff Alexis Fennessy resides in Newport News, Virginia. She is married with no children. She does not work; her husband is a law enforcement officer. She shopped at one or more Target retail stores in Virginia regularly during the Class Period, purchasing items such as personal hygiene products, toothpaste, cleaning supplies, cat supplies, animal toys and treats, snacks, soda, home décor and decorations. She was aware of the tariffs at the time and attributed price increases she noticed while shopping to the tariffs. She purchased items from Target's in-house brands.

95. Plaintiff Parveen Sangha resides in North Royalton, Ohio. She is retired, and her three children live with her. She shopped at one or more Target retail stores in Ohio during the Class Period. She typically purchased items such as household products, clothing, cards, and toys.

96. Plaintiff Lauren Wolf resides in Fort Worth, Texas. She shopped at one or more Target retail stores in Texas during the Class Period, typically at least once per week. She spent about $250 per week at Target. She regularly bought groceries, clothing, shoes, toys, and household items (like trash bags, paper towels, cleaning supplies) and baby items at Target. She noticed items becoming substantially more expensive during the Class Period. She purchased items from Target's in-house brands.

97. Plaintiff Rozaliya Ripa resides in Round Rock, Texas. She shopped at a Target retail store in Texas often during the Class Period, purchasing everything from plates to seed supplies, food, bins and storage for herself, her family and her friends. She purchased items from Target's in-house brands.

98. Nearly all of the Plaintiffs used credit cards for some or all of their purchases at Target retail stores during the Class Period.

## CLASS ACTION ALLEGATIONS

99. Plaintiffs bring this action on behalf of themselves, individually, and on behalf of all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2), (b)(3), and (c)(4), on behalf of the following class:

> **Nationwide Class:** All persons who made in-store purchases from any Target retail store of any consumer good or other item subject to the tariffs imposed under IEEPA, during the period from February 1, 2025, through February 24, 2026, at a price that Target increased to pass through some or all of the IEEPA tariffs imposed on that good.

100. Plaintiffs bring claims on behalf of the Nationwide Class under Count One (unjust enrichment), Count Two (money had and received), Count Three (breach of contract), Count Four (Minnesota Consumer Fraud Act) and Count Eight (declaratory relief).

101. Plaintiffs reserve the right to propose groupings of states by their laws shared elements in such a way as to make the litigation manageable, or to add classes or subclasses reflecting such groupings, as appropriate based on further factual and legal development and the Court's rulings.

102. Additionally, Plaintiffs ask the Court to certify state-protection claims on behalf of consumers in each state in which a given Plaintiff purchased goods, in-store, at Target retail stores pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and (c)(4). For each state, counsel will ask the Court to certify a class as follows:

> **State Classes**: All persons who made in-store purchases from any Target retail store in [STATE] of any consumer good or other item subject to the tariffs imposed under IEEPA, during the period from February 1, 2025, through February 24, 2026, at a price that Target increased to pass through some or all of the IEEPA tariffs imposed on that good.

103. Plaintiffs ask that State Classes be certified for the following states: Pennsylvania, New Jersey, New York, Virginia, Ohio and Texas.

104. Plaintiffs are bringing claims on behalf of the State Classes under each of the Counts in this Complaint.

105. For instance, Plaintiff Parveen Sangha purchased goods at a Target retail store in the State of Ohio, and therefore, asserts common law and consumer-protection claims under the law of the State of Ohio on behalf of a class of Target customers who likewise purchased goods at a Target retail store in the State of Ohio.

106. Plaintiffs respectfully ask the Court to construe the above requests broadly and flexibly to achieve a just result. Plaintiffs reserve the right to amend or modify the class definition(s), to ask the court to create subclasses, and to limit the classes or subclasses based on particular issues. Additional customers of Target might file subsequently, and Plaintiffs ask the Court to liberally allow additional plaintiffs to join this suit in order to produce a just and full remedy.

107. The Nationwide Class and State Classes are referred to herein collectively as the "Class," unless otherwise stated.

108. The period from February 1, 2025, through February 24, 2026, is referred to herein as the "Class Period."

109. This action satisfies all of the explicit and implied requirements of Fed. R. Civ. P. 23(a) and Rule 23(b), including numerosity, typicality, adequacy, superiority, predominance and ascertainability.

110. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. Target operates approximately 2,000 total retail stores nationally. Each week, more than 30 million customers shop at Target's stores. Thus, there will be millions of members of the Class. The Class far exceeds the number necessary to satisfy Rule 23(a)(1).

111. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs, like every other member of the Class, purchased products in-store from Target that were subject to price increases attributable to tariffs, and were injured as a result of paying that unfairly elevated price without later receiving reimbursement of the portion of that price attributable to tariffs. Moreover, Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class. Each Plaintiff seeks to represent only consumers whose injuries and rights resemble those of that Plaintiff.

112. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are each committed to the vigorous prosecution of this action and have no interests that are adverse or antagonistic to the Class or potential subclasses described above. Plaintiffs have retained counsel who are competent and experienced in class action litigation, and counsel has been certified as lead counsel in prior cases.

113. **Superiority**. A class action is superior to all other available means for the fair and efficient adjudication of the Class's claims. The damages suffered by certain individual members of the Class are relatively small compared to the burden and expense of individual prosecution of the complex litigation required to recover from Target. It would therefore be impractical for most, if not all, members of the Class to seek relief on an individual basis. Individual litigation could result in thousands or even hundreds of thousands of individual lawsuits, introducing a serious risk of inconsistent or contradictory judgments arising from the same set of facts, and increasing the delay and expense to all parties. As a practical matter, millions of potential claimants would not

file and would be deprived of a fair remedy. In contrast, a class action would present few administrative difficulties and a strong process to provide broad relief. A class action provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court. It presents no material management difficulties under the circumstances here.

114. **Predominance of Common Questions of Law and Fact**. Numerous questions of law and fact are common to Plaintiffs and all members of the Class. These common questions will result in common answers for all members of the Class that will impact the resolution of the claims on grounds equally applicable to all members of the Class. These common questions, which predominate over any questions affecting only individual members of the Class, include, but are not limited to:

a. Whether Target engaged in the policies and practices alleged herein;

b. Whether the higher prices that customers paid at Target are attributable to IEEPA tariffs;

c. Whether Target passed through some or all of the tariffs to consumers in the form of higher prices;

d. Whether Target is obligated to return to customers a sum equal to the amount by which Target raised prices on goods as a result of and response to IEEPA tariffs;

e. Whether Target privately knew and/or had reason to believe that the IEEPA tariffs would ultimately be determined to be illegal, but nonetheless instituted the policy, practice and pattern of passing the elevated tariff costs of goods sold to its customers, including Plaintiffs and the Class and the associated practice and pattern of giving none of the tariff refunds to those same customers;

f. Whether Target's retention of price increases attributable to tariffs constitutes unjust enrichment, "money had and received", or a breach of contract under Target's own uniform terms and conditions and background sources of contract law;

g. Whether Target acted unfairly, unlawfully, deceptively, or unconscionably by up-charging consumers in response to tariff-related costs under state law while failing to reimburse consumers upon learning the tariffs were illegal, or otherwise violating applicable state consumer protection laws;

h. The measure of damages available to Plaintiffs and the Class due to increased prices caused by Target's tariff pass-through; and

i. The appropriate measure of restitution, actual damages, consequential damages, statutory damages, punitive damages, or other forms of relief due to Target's conduct.

115. **Ascertainability**. The members of the Class are ascertainable through objective criteria typical of class action practice and procedure, including through Target's own transaction, pricing and customer records, along with receipts, credit card records (and similar purchase records), account histories, or other ordinary proof of purchase. Determining whether a consumer is a Member of the Class does not require an individualized inquiry into subjective intent, knowledge, or reliance, but only a straightforward review of objective purchase and pricing information.

## <u>COUNT ONE</u>
## Unjust Enrichment
## (On behalf of Plaintiffs and the Class)

116. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

117. An equitable claim for unjust enrichment lies where no valid and enforceable contract governs the claim, the plaintiff has conferred a benefit on the defendant, the defendant has knowledge of the benefit and has accepted or retained the benefit conferred, and the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.

118. Neither Plaintiffs nor any member of the Class entered into any valid and enforceable agreement that addresses Target's decision to pass through the cost of a tariff and then refuse to return that money even after the tariff was declared unlawful and Target recovered those same amounts from the U.S. government.

119. Courts routinely award relief in equity rather than breach of contract where, as here, a retailer refuses to refund consumer payments attributable to the pass-through of government fees or taxes that were later deemed to be unlawful.

120. Plaintiffs and the members of the Class conferred a direct and ascertainable benefit on Target in the form of additional money paid through tariff-inflated prices on goods subject to the IEEPA tariffs.

121. Target has knowledge of and has accepted or retained those benefits to the detriment of Plaintiffs and members of the Class and at their expense.

122. Target has not returned, offered to return, or indicated any intention to return these amounts to the customers who paid them, even after receiving refunds from the U.S. government or receiving reasonable assurances that Target would be fully reimbursed for the same tariff costs that Target passed through to Plaintiffs and members of the Class. Target is thereby obtaining a double recovery for sums it already passed through to Plaintiffs and members of the Class.

123. Target is willfully, knowingly and intentionally choosing not to return those amounts to Plaintiffs.

124. But for the imposition of the IEEPA tariffs, Target would not have incurred the tariff costs at issue and would not have imposed the corresponding tariff-related price increases on Plaintiffs and members of the Class.

125. Plaintiffs and members of the Class have no mechanism through the customs-refund process to recover the tariff costs that Target passed through to them.

126. Target knew of and voluntarily accepted the benefits conferred by Plaintiffs and the Class. Target's own public statements and earnings disclosures make clear that Target made willful, knowing and intentional decisions to raise prices on goods due to the illegal tariffs.

127. Plaintiffs and the Class paid the tariff-inflated prices directly to Target, and Target directly received and retained those payments. No third party stands between Plaintiffs' payment of the tariff-inflated price and Target's receipt of the benefit for which Plaintiffs and the Class seek restitution or other remedies.

128. Target is continuing to retain those payments, even though it has now received approximately $1 billion in refunds from the U.S. government for the unlawful IEEPA tariffs.

129. Even if Target has not received a complete recovery from the U.S. government thus far, it must return to Plaintiffs and the Class the sums it has already received, as well as any future sums Target receives from the U.S. government.

130. It would be unjust and inequitable for Target to retain both (1) the increased charges attributable to tariffs that Target collected from Plaintiffs and the Class through inflated retail prices and (2) government refunds corresponding to those same unlawful tariffs.

131. This double recovery—from consumers and from the government for the identical cost that Target incurred—offends the principles of equity and good conscience that are the basis for the unjust enrichment cause of action.

132. Plaintiffs do not seek restitution of the full purchase price of the affected goods under this Count, nor do they contend that Target was unjustly enriched merely because it earned revenue or profit from those transactions. Plaintiffs seek only the portion of the purchase price attributable to tariff costs that Target passed through to consumers and that Target subsequently recovered from or will recover from the United States (or a U.S. agency or government-controlled process). Even if Target has not received a complete recovery from the U.S. government thus far, it must return to Plaintiffs and the Class what it has already received, as well as any future sums Target receives from the U.S. government.

133. This information (the amount of the price increase passed through to Plaintiffs and members of the Class) is ascertainable through Target's records, through discovery, and through fact-finding by a jury.

134. Plaintiffs and the Class are entitled to restitution, disgorgement, and such other relief as is available under the law or the Court deems appropriate.

135. The foregoing allegations state a claim for unjust enrichment against Target under the law of each State in which Target owns or operates a retail store. In the alternative, the foregoing allegations state a claim for unjust enrichment under the law of many States in which Target owns or operates a retail store.

136. This claim is pleaded in the alternative to Plaintiffs' breach of contract count (Count Three).

## COUNT TWO
**Money Had and Received**
**(On behalf of Plaintiffs and the Class)**

137. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

138. Money had and received is an equitable cause of action that lies where Target received money that in equity and good conscience should be returned to Plaintiffs.

139. Target received money from Plaintiffs and from each Member of the proposed Class in the form of higher prices due to the pass-through of IEEPA tariff costs.

140. Target benefited from its receipt of these amounts because the tariff-related portion of the prices paid by Plaintiffs and the members of the Class reimbursed or offset costs Target had incurred in paying the IEEPA tariffs.

141. Target imposed the tariff-related price increases in order to offset, recover, or defray the additional costs it incurred as a result of paying the IEEPA tariffs on imported merchandise.

142. Plaintiffs and the Class paid the tariff-inflated prices directly to Target, and Target directly received and retained those payments. No third party stands between Plaintiffs' payment of the tariff-inflated price and Target's receipt of the benefit for which restitution is sought.

143. But for the imposition of the IEEPA tariffs, Target would not have incurred the tariff costs at issue and would not have imposed the corresponding tariff-related price increases on Plaintiffs and the Class.

144. Target has received approximately $1 billion in refunds for the invalidated IEEPA tariffs from the U.S. government.

145. Even if Target has not received a complete recovery from the U.S. government thus far, it must return to Plaintiffs and the Class the sums it has already received, as well as any future sums Target receives from the U.S. government.

146. Target knows that the governmental refunds correspond to tariff costs that it previously passed through, in whole or in part, to consumers, yet has retained the resulting

duplicate recovery and has neither returned the money nor offered to return the corresponding amounts to Plaintiffs and the Class.

147. Target is now retaining both the amounts collected from its customers to offset those unlawful tariff costs and the governmental refunds of those same costs. Those amounts are money that, in equity and good conscience, belonged and ought to be returned to Plaintiffs and the members of the Class.

148. Target owes Plaintiffs and the members of the Class an ascertainable amount equal to the tariff-related price increases paid by them for which Target has received corresponding reimbursement from the United States.

149. Plaintiffs do not seek restitution of the full purchase price of the affected goods; Plaintiffs seek only the portion of the purchase price attributable to tariff costs that Target passed through to consumers and that Target subsequently recovered from the government.

150. Plaintiffs and the Class are entitled to recover from Target such sums, together with prejudgment interest.

151. The foregoing allegations state a claim for money had and received against Target under the law of each State in which Target owns or operates a retail store. In the alternative, the foregoing allegations state a claim for money had and received under the law of many States in which Target owns or operates a retail store.

152. This claim is pleaded in the alternative to Plaintiffs' breach of contract claim (Count Three).

## COUNT THREE
## Breach of Contract
## (On behalf of Plaintiffs and the Class)

153. Plaintiffs hereby incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

154. This Count is pleaded in the alternative pursuant to Rule 8(d). If the Court determines that an enforceable contract governed the parties' rights and obligations with respect to the allegations in this Complaint, then Target has breached that contract as set forth below.

155. Any contract entered into by each of the Plaintiffs and the members of the proposed Class and Target only allowed Target to charge, collect, or retain lawful, valid, and authorized duties, tariffs, or related surcharges.

156. No written or verbal proposal or offer by either Plaintiffs or Target authorized Target to charge, collect, or retain unlawful, invalid, or unauthorized duties, tariffs, or fees.

157. If the Court decides that any relevant contract governs the applicable transactions, nothing in such contract or applicable law permits a company to charge, collect, or retain unlawful, invalid, or unauthorized duties, tariffs, or fees.

158. Target's conduct breached the implied covenant of good faith and fair dealing inherent in any contract by failing to pass along to the consumers any refund of tariffs that Target received or will receive for sums that Target already passed through to consumers. In other words, if there is a contract, that contract should be construed as requiring Target to refund passed-through price increases attributable to illegal tariffs.

159. Target acted in bad faith and in a manner that is unconscionable by imposing tariff-inflated price increases across thousands of goods and then retaining the resulting amounts even after the tariffs were declared unlawful and the U.S. government refunded the corresponding tariff amounts to Target.

160. Target's conduct deprived Plaintiffs and the members of the Class of the benefits of the bargain, which was to pay only lawful and authorized charges and not to be charged sums that were later adjudicated to be based on illegal tariffs for which Target was or would be reimbursed.

161. Plaintiffs and the Class suffered ascertainable losses as a direct and proximate result of Target's conduct, including but not limited to the amounts they paid in tariff-related surcharges and/or inflated prices.

162. The foregoing allegations state a claim for breach of contract (as an alternative claim) under the law of each State in which Target owns or operates a retail store. In the alternative, the foregoing allegations state a claim for breach of contract (as an alternative remedy) under the law of many States in which Target owns or operates a retail store.

**COUNT FOUR**
**Violation of Minnesota Consumer Fraud Act,**
**Minn. Stat. § 325F.69**
**(On behalf of Plaintiffs and the Class)**

163. Plaintiffs hereby incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

164. Target's decisions to respond to the IEEPA tariffs by raising prices across the nation and then retaining the resulting amounts even after the tariffs were found unlawful and after the United States began to issue refunds to Target, occurred in, originated from, and were directed from their corporate headquarters in Minnesota. The Minnesota Consumer Fraud Act therefore applies to the conduct alleged herein on a nationwide basis, and Plaintiffs and the Class may assert claims on behalf of a nationwide class under the Minnesota Consumer Fraud Act.

165. A practice qualifies as unfair and unconscionable in violation of the Minnesota Consumer Fraud Act if it offends public policy established by Minnesota statutes, rules, or common law; if it is unethical, oppressive, or unscrupulous; or if it is substantially injurious to consumers.

166. Target's conduct offends the public policy—established in Minnesota statutes, rules and common law authorities—that a refund, reimbursement, or surplus attributable to a

discrete charge should benefit the person who actually bore that charge, rather than create an unbargained-for windfall for the intermediary who paid or received it.

167. Target engaged in unethical, oppressive, or unscrupulous conduct by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that it had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Target had received refunds of those sums;

d. Undertaking a scheme where it raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

168. There is no consumer or competitive benefit to allowing Target to keep both (1) the surcharge that it charged to consumers because of passed-through tariff-related costs and (2) the refund from the U.S. government.

169. Target has received nearly $1 billion in refunds for the invalidated IEEPA tariffs from the U.S. government in the second quarter of 2026 alone.

170. Target's conduct was substantially injurious to consumers. The injury was monetary, concrete, and widespread. Consumers together paid more for ordinary retail goods than

they would have paid absent the unlawful tariffs, while Target ultimately bears none or substantially less of the tariff costs corresponding to the nearly $1 billion in tariff refunds it has received. Consumers received no corresponding benefit from Target's retention of both amounts.

171. Target is a corporation, company and business entity and therefore a person under Minn. Stat. § 325F.68, subd. 3.

172. Plaintiffs and members of the Class are natural persons injured in connection with a sale of merchandise for personal, family, or household purposes.

173. Target's conduct occurred in connection with the sale of merchandise.

174. Target undertook its decision to obtain and retain a double recovery with the intent to influence the conduct of consumers or other persons. A retailer increases the price of merchandise in order to obtain the increased price from purchasers. Target could not have shifted its tariff costs to consumers —as it intended to do—unless consumers acted in accordance with the increased prices and paid them. Target's surrounding conduct, including declaring the price increases a "very last resort" even as it raised prices on thousands of products, and in changing its labeling and ticketing practices to induce purchases in stores despite the higher prices, is only further evidence that it hoped to influence the conduct of consumers to purchase the goods in question in order to successfully implement its scheme.

175. Target's conduct directly and proximately caused Plaintiffs' economic injuries. Plaintiffs and members of the Class paid identifiable inflated amounts they would not have paid absent Target's tariff-related pricing practice.

176. This action benefits the public by seeking to remedy, declare unlawful, and deter the recurrence of unfair practices affecting consumers generally.

177. Plaintiffs and members of the Class are entitled to compensatory damages, costs and disbursements, costs of investigation, reasonable attorneys' fees, and such other relief as is available under the law or the Court deems appropriate.

**COUNT FIVE**
**Violation of New Jersey Consumer Fraud Act,**
**N.J.S. 56:8-1 et seq.**
**(on behalf of Plaintiff Barbara Grazioli**
**and the New Jersey State Class)**

178. Plaintiff Barbara Grazioli hereby realleges and incorporates the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further alleges as follows.

179. Target engaged in an unconscionable commercial practice or other unlawful conduct in violation of N.J.S.A. 56:8-2, by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that it had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Target had received refunds of those sums;

d. Undertaking a scheme where it raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from

consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

180. The aforementioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

181. Plaintiff and members of the New Jersey State Class suffered ascertainable losses as a direct and proximate result of Target's unlawful conduct, including the amounts they paid in tariff-inflated prices.

182. There is no consumer or competitive benefit to allowing Target to keep both (1) the surcharge that it charged to consumers because of passed-through tariff-related costs and (2) the refund form the U.S. government.

183. Target has received nearly $1 billion in refunds for the invalidated IEEPA tariffs from the U.S. government in the second quarter of 2026 alone.

184. Target's practices were willful, knowing and intentional, as Target purposefully raised consumer prices in response to tariff costs while simultaneously positioning itself to obtain government refunds for those same costs; and Target is now choosing not to return the ill-gotten gains to consumers with full knowledge and purpose that it has pursued and now obtained a double recovery.

185. Plaintiff Grazioli and the members of the New Jersey State Class suffered injury in fact as a direct and proximate result of Target's unlawful practices.

186. Plaintiff Grazioli and the members of the New Jersey State Class are entitled to treble damages, together with reasonable attorneys' fees, filing fees, costs of suit, and such other relief as is available under the law or the Court deems appropriate.

**COUNT SIX**
**Violation of Ohio Consumer Sales Practices Act**
**Ohio Revised Code § 1345.01 et seq.**
**(On behalf of Plaintiff Parveen Sangha**
**and the Ohio State Class)**

187. Plaintiff Parveen Sangha hereby realleges and incorporates the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows:

188. Target engaged in an unfair act under Ohio Revised Code § 1345.02, an unconscionable act under § 1345.03, or another covered transaction, by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that it had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Target had received refunds of those sums;

d. Undertaking a scheme where it raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

189. The above forementioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

190. There is no consumer or competitive benefit to allowing Target to keep both (1) the surcharge that it charged to consumers because of passed-through tariff-related costs and (2) the refund form the U.S. government.

191. Target has received nearly $1 billion in refunds for the invalidated IEEPA tariffs from the U.S. government in the second quarter of 2026 alone.

192. Target's conduct is a consumer transaction that occurred in the course of trade or commerce.

193. Target's conduct affects the public interest, given that vast numbers of consumers are affected by Target's unfair practices.

194. Target's practices were willful, knowing and intentional, as Target purposefully raised consumer prices in response to tariff costs while simultaneously positioning itself to obtain government refunds for those same costs; and Target is now choosing not to return the ill-gotten gains to consumers with full knowledge and purpose that it has pursued and now obtained a double recovery.

195. Plaintiff Sangha and the members of the Ohio State Class suffered ascertainable losses as a direct and proximate result of Target's unlawful conduct, including the amounts they paid in tariff-related surcharges and/or inflated prices.

196. Plaintiffs Sangha and the members of the Ohio State Class suffered injury in fact, loss of money, and the loss occurred as a result of the unlawful, unfair or deceptive acts or practices.

197. Plaintiff Sangha and the members of the Ohio State Class are entitled to the rescission of the transaction; actual economic damages; attorneys' fees and costs; and such other relief as is available under the law or the Court deems appropriate.

**COUNT SEVEN**
**Violation of Texas Deceptive Trade Practices-Consumer Protection Act, Texas Bus. And Comm. Code §§ 17.41 et seq.**
**(On behalf of Plaintiffs Lauren Wolf, Rozaliya Ripa and the Texas State Class)**

198. Plaintiffs Lauren Wolf and Rozaliya Ripa hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

199. Target engaged in an unconscionable action or course of action by:

a. Obtaining a double recovery by collecting the same sum of money twice: first from consumers through higher prices, then from the government through refunds.

b. Forcing consumers to bear the economic burden of tariffs through higher prices, but keeping the corresponding refund, leaving consumers injured and the company overcompensated.

c. Effecting a windfall recovery by refusing to return tariff surcharges that it had shifted onto consumers (in the form of higher prices) even after the Supreme Court had declared the tariffs unlawful and Target had received refunds of those sums;

d. Undertaking a scheme where it raised prices across thousands of goods due to tariffs with the aim of simultaneously obtaining inflated payments from consumers based on unlawful tariffs while also obtaining a full refund of tariffs from the U.S. government (should the tariffs be invalidated).

200. The above forementioned conduct offends established public policy, is immoral, oppressive, or unscrupulous, is unconscionable, and is substantially injurious to consumers who have no avenue to seek a refund from the government directly.

201. Plaintiffs Wolf and Lipa and members of the Texas State Class are consumers who sought or acquired goods or services by purchase or lease, with those goods or services forming the basis of the complaint.

202. There is no consumer or competitive benefit to allowing Target to keep both (1) the surcharge that it charged to consumers because of passed-through tariff-related costs and (2) the refund form the U.S. government.

203. Target has received nearly $1 billion in refunds for the invalidated IEEPA tariffs from the U.S. government in the second quarter of 2026 alone.

204. The transactions at issue were consumer transactions that occurred in the course of trade or commerce.

205. Target's conduct affects the public interest, given that vast numbers of consumers are affected by the companies' unfair practices.

206. Target's practices were willful, knowing and intentional, as Target purposefully raised consumer prices in response to tariff costs while simultaneously positioning itself to obtain government refunds for those same costs; and Target is now choosing not to return the ill-gotten gains to consumers with full knowledge that it has pursued and now obtained a double recovery.

207. Plaintiffs Wolf and Lipa and the members of the Texas State Class incurred ascertainable losses as a direct and proximate result of Target's unlawful conduct, including the amounts they paid in tariff-related surcharges and/or inflated prices.

208. Plaintiffs Wolf and Lipa and the members of the Texas State Class suffered injury in fact, loss of money, and the loss occurred as a result of the unlawful or unconscionable acts or practices.

209. Plaintiffs Wolf and Lipa and the members of the Texas State Class are entitled to restoration of the money; economic damages; economic damages; treble damages; injunctive relief; attorneys' fees and costs; and such other relief as is available under the law or the Court deems appropriate.

**COUNT EIGHT**
**Declaratory Relief, 28 U.S.C. § 2201**
**(On behalf of Plaintiffs and the Class)**

210. Plaintiffs hereby reallege and incorporate the allegations contained in all Paragraphs prior to this paragraph as though fully set forth herein and further allege as follows.

211. Plaintiffs allege this claim individually and on behalf of the proposed Class.

212. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

213. Plaintiffs' claims present an actual controversy as to the rightful ownership of the tariff surcharges paid to Target.

214. Plaintiffs have suffered an injury by Target's unlawful retention of the tariff refund.

215. Plaintiffs and the Class request that this Court exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiff and the Class but refunded to Target is unlawful for the above-stated reasons, and that Target is obligated to return to Plaintiffs and the Class all IEEPA tariffs passed on to consumers through higher prices with interest.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the proposed Class, respectfully request that this Court enter judgment in their favor and against Target and grant the following relief:

A. An order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; appointing Plaintiffs as Class Representatives and the undersigned counsel as Class Counsel; and directing that notice of this action be given to members of the Class;

B. An order that Target's actions violate the state consumer protection laws and common law principles pled in this Complaint, and that Target is obligated to return to Plaintiffs and the members of the Class all IEEPA tariffs passed through to customers in the form of higher prices, with interest or sums Target receives or has received from the federal government to reimburse Target for unlawful IEEPA tariffs;

C. An award to Plaintiffs and the Class of (a) restitution and disgorgement, (b) actual damages, (c) consequential damages, including treble damages, (d) statutory damages, (e) punitive damages, and/or (f) any other damages authorized under law, in the amount to be determined at trial;

D. An award of pre-judgment and post-judgment interest;

E. An award to Plaintiffs and the Class of reasonable attorneys' fees and costs;

F. An order directing an accounting of all IEEPA tariff surcharges collected from consumers and all IEEPA tariff refunds received or anticipated to be received from the U.S. government;

G. Such other and further legal and equitable relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: August 27, 2026


*/s/ Laura K. Mummert*

Jason H. Kim (*pro hac vice forthcoming*)
**SCHNEIDER WALLACE COTTRELL KIM LLP**
515 S. Figueroa Street, Suite 1060
Los Angeles, CA 90071
Tel: (415) 421-7100
jkim@schneiderwallace.com

Todd M. Schneider (*pro hac vice forthcoming*)
Raymond S. Levine (*pro hac vice forthcoming*)
**SCHNEIDER WALLACE COTTRELL KIM LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
tschneier@scheniderwallace.com
relevine@schneiderwallace.com

Laura K. Mummert (Bar No. 85964)
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street - Suite 1200
Philadelphia, PA 19102
Tel: 215-854-4060
lmummert@litedepalma.com
Noah A. Messing (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel: (212) 960-3720
nm@messingspector.com

Phillip M. Spector (*pro hac vice forthcoming*)
**MESSING & SPECTOR LLP**
145 West Ostend Street, Suite 600
Baltimore, MD 21230
Tel: (212) 960-3720
ps@messingspector.com

*Attorneys for Plaintiffs*